## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**CHRISTINA COX**                                                                                              **PLAINTIFF**

**v.**                                   **Case No. 4:24-cv-00760-KGB**

**LHC GROUP, INC.**                                                                                          **DEFENDANT**

### OPINION AND ORDER

Plaintiff Christina Cox ("Cox") filed suit against defendant LHC Group, Inc. ("LHC") alleging that LHC terminated her employment in violation of public policy because she made complaints to the company's compliance hotline (Dkt. No. 2). LHC removed the case to this Court (Dkt. No. 1). Before the Court is LHC's motion for summary judgment (Dkt. No. 16). Cox filed a response to LHC's motion for summary judgment (Dkt. No. 20). LHC filed a reply in support of its motion for summary judgment (Dkt. No. 23). For the reasons explained below, the Court denies LHC's motion for summary judgment.

### I.      Factual Background

The following facts are taken from the parties' undisputed statement of facts (Dkt. Nos. 18, 19) unless otherwise noted as set forth in this Court's Opinion and Order.

LHC is a home health care company (Dkt. No. 19, ¶ 1). LHC operates through a number of local health care agencies, including Elite Hospice – Searcy ("Elite Hospice") (*Id*., ¶ 2).

Cox worked for LHC at Elite Hospice from October 2021 until March 28, 2024 (*Id*., ¶ 8). From the beginning of Cox's employment until December 2023, Shawna Fry was the Executive Director of Elite Hospice (*Id*., ¶ 14). Sara Woods began as the interim Executive Director of Elite Hospice in November 2023 and remained in that position through the time Cox's employment was

terminated in late March 2024 (*Id*., ¶ 15).  During Cox's employment, Amber Paslay and Alesha Sawrie were patient care managers for Elite Hospice and were Cox's direct supervisors (*Id*, ¶ 16).

Cox was initially hired as a registered nurse case manager (*Id*., ¶ 17).  In March 2022, Cox was transferred to a weekend on-call position (*Id*., ¶ 18).  In that role, Cox attended to patient calls and needs from 4:30 p.m. on Friday through 8:30 a.m. on Monday (*Id*.).  In March 2024, Cox was transferred to a "seven-on, seven-off" role, which meant that she worked the night shift every day for seven days in a row, responding to calls from patients who were assigned to other case managers (*Id*., ¶ 22).

On March 1, 2024, Woods received an email from an LHC employee stating that a patient, D.P., was possibly out of compliance with hospice regulations because he had not received a visit from a registered nurse within the required time frame (*Id*., ¶ 39).  On March 1, 2024, Woods responded to the email, stating "[t]hank you for catching this! He'll hwv4 [sic] yo [sic] be dischsrged [sic] for being out of compliance. I'll review his record and get the PCM, HMD, compliance, and quality together and we'll get him discharged next week." (*Id*., ¶ 40 (citing 19-3)).

On March 5, 2024, while Cox was not on duty, Cox received a call from her sister, Brandy P., about Brandy P.'s father-in-law, D.P. (*Id*., ¶ 41).  Brandy P. called Cox to discuss D.P. potentially being discharged from LHC hospice care (*Id*.).  Cox never provided direct care to D.P. as part of her job duties for LHC (*Id*., ¶ 42).  March 5, 2024, was the first time Cox spoke with Brandy P. about D.P. potentially being discharged from LHC hospice care, and it was also the first time Cox became aware D.P. was possibly going to be discharged from hospice care with LHC (*Id*., ¶ 43).  Paslay told Danielle P. that D.P. was being discharged on March 6, 2024 (*Id*.).  Danielle P. testified that she had no idea why her father was being discharged, and that Paslay would not

provide her with a reason for the discharge (*Id.*).  Cox told Brandy P. that, for reasons under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d ("HIPAA"), she could not speak with her about D.P.'s hospice care because Brandy P. was not listed as one of D.P.'s permitted caregivers (*Id.*, ¶ 44).  On March 5, 2024, Danielle P., D.P.'s daughter and permitted caregiver, called Cox to give her permission to speak with Brandy P. about D.P. (*Id.*, ¶ 45).

On March 5, 2024, Cox looked in D.P.'s chart and explained to Danielle P. and Brandy P. that he was reported to have missed nursing visits (*Id.*, ¶ 46).  According to D.P.'s chart, D.P. missed registered nurse visits because of LHC nurse cancellations, not because of patient refusal (*Id.*, ¶ 47).  Cox thought that D.P.'s missed visits did not warrant a discharge from hospice services because the cancellations were not his fault (*Id.*, ¶ 48).  Defendant's nurses cancelled their visits to D.P. for "staff emergency/illness" on December 29, 2023, February 15, 2024, and February 22, 2024, and for inclement weather on January 15, 2024, and January 16, 2024 (*Id.*).  On February 8, 2024, the LHC nurse scheduled to visit D.P. called D.P. to say she "wouldn't be coming to see him today due to an emergency," but the LHC nurse marked the visit as a missed due to the caregiver or patient refusing it (*Id.*).  LHC's own records state that the LHC nurse cancelled the February 8, 2024, visit because the LHC nurse had an emergency (*Id.*).  On other dates, like February 12, 2024, and February 29, 2024, LHC nursing staff noted that visits were missed because D.P. would not answer the door or the phone (*Id.*).  Yet, as Cox later noted in her complaint to LHC's compliance hotline, D.P. did receive visits from home health aides on both February 12, 2024, and February 29, 2024, indicating D.P. was home and was not refusing to answer the door.

Cox thought there was a misunderstanding as to why D.P. was being discharged, so she spoke with Paslay and Woods about the situation and her concern (*Id.*, ¶ 49).  During these

conversations, Cox told Paslay and Woods that LHC could not discharge D.P. because that would be a violation of LHC's policy (*Id*., ¶ 50).

After her March 5, 2024, talk with Paslay and Woods, Cox anonymously called LHC's compliance hotline and complained that Woods planned to discharge D.P.'s services even though the patient notification protocol was not followed (*Id*., ¶ 51). Later that same day, Cox received the complaint by email, reviewed the complaint for accuracy, and responded with more information to add to the complaint (*Id*., ¶ 53).

On March 6, 2024, Woods emailed LHC's quality and compliance teams seeking advice regarding the appropriate course of action for D.P. (*Id*., ¶ 54). Woods explained that D.P. had not received a timely visit from a registered nurse and that she believed he would need to be discharged from services (*Id*., ¶ 55). Later that day, LHC's quality and compliance teams responded that LHC could continue D.P.'s services and did not need to discharge the patient (*Id*., ¶ 56). D.P. was not discharged from LHC hospice care on March 6, 2024 (*Id*., ¶ 57).

On March 6, 2024, LHC began an investigation into Cox's anonymous compliance complaint (*Id*., ¶ 58). On March 7, 2024, during the investigation into the complaint, LHC's compliance audit team spoke with Paslay, Woods, and the individual from LHC's compliance team who instructed Woods to continue D.P.'s care (*Id*., ¶ 59). LHC reviewed D.P.'s record and the email chain between Woods and its quality and compliance teams (*Id*., ¶ 60). LHC determined that Cox's allegation was unsubstantiated because D.P. was not discharged (*Id*., ¶ 61).

LHC verbally coached Woods as a result of the investigation into Cox's complaint (*Id*.). Woods also conducted an additional training on March 6, 2024, regarding missed visits to patients (*Id*.). Woods admitted that LHC nurses "were used to missing visits" to hospice patients as it was a regular practice they had engaged in "for some time." (*Id*.). During the March 6, 2024, training,

4

Woods told employees that they should not miss patient visits due to staff illnesses or staffing emergencies, as happened with D.P. (*Id.*).

On March 7, 2024, Woods received a call from Cox regarding a situation that occurred during her shift (*Id.*, ¶ 62). While Cox was driving to visit a deceased patient, she received, and acknowledged, a call that another living patient had fallen (*Id.*, ¶ 63). The parties dispute the remainder of the material facts regarding the call (*Id.*, ¶¶ 64–65).

The parties dispute whether LHC required nurses to visit a patient's home within one hour of a reported death (*Id.*, ¶¶ 66–69). Kerin Smith ("Smith"), a former LHC Executive Director, testified that, although LHC has no written policy requiring nurses to visit a patient's home within one hour of a reported death, it was widely understood to be best practice in LHC because "you don't want a dead body waiting in somebody's home longer than an hour." (*Id.*, ¶ 68).

On March 7, 2024, following the call between Woods and Cox, Woods emailed Jen Boutte, Employee Relations Specialist, explaining the March 7, 2024, patient situation and requesting a discussion about initiating a 30-day performance improvement plan for Cox (*Id.*, ¶ 69).

On March 15, 2024, LHC received a complaint from a patient's daughter, who stated that she would not call LHC for services for her parent if Cox was on-call (*Id.*, ¶ 70). As part of that complaint on March 15, 2024, the patient's daughter explained to LHC that the previous weekend Cox had been rude and hurt the daughter's feelings (*Id.*, ¶ 71). The parties dispute the description of the patient complaint (*Id.*). On March 19, 2024, LHC received a complaint from a patient about a conversation with both a triage nurse and with Cox (*Id.*, ¶ 72 (citing Dkt. No. 16-1, at 51)). The parties dispute the description of the patient complaint (*Id.*, ¶¶ 72–73).

On March 19, 2024, following the March 15, 2024, and March 19, 2024, patient complaints, Woods, in consultation with Boutte and Courtney Butler, Vice President of

Operations, decided to provide Cox with a final warning, instructing Cox that if there were any additional issues regarding her behavior, she would be terminated (*Id*., ¶ 74).

On March 21, 2024, Woods asked Cox to come into the office for a meeting (*Id*., ¶ 75). On March 21, 2024, Woods and Butler met with Cox to discuss the recent patient complaints, counsel her on her behavior going forward, and give her a final warning (*Id*., ¶ 76).

During the March 21, 2024, meeting, Cox was informed of the recent patient complaints LHC received about her (*Id*., ¶ 77).

According to Butler who attended the March 21, 2024 meeting, it was explained to Cox that she needed to prioritize her on-call tasks while on shift and that she should only call her supervisor with urgent questions, instead of calling her supervisor to complain that she did not want to drive to see an additional patient (*Id*., ¶ 78). According to Butler and Woods, the March 21, 2024, meeting also included a discussion of LHC's Standards of Behavior and the importance of being respectful to leadership (*Id*., ¶ 79). During the March 21, 2024, counselling conversation, it was made clear to Cox that, if there were any additional issues with Cox's behavior, she would be terminated (*Id*., ¶ 80; *see also* Butler Decl. ¶ 8; Cox Depo. 133:12-16, 187:3-19). During the March 21, 2024, meeting, Cox stated that she was being retaliated against because she called the compliance hotline on March 5, 2024, about D.P. (*Id*., ¶ 81).

On March 22, 2024, Sawrie emailed Woods to complain about the way Cox spoke to her during a call and to provide a summary of the call that occurred the same day (*Id*., ¶ 89). After receiving Sawrie's March 22, 2024, e-mails, Woods, in consultation with Butler and Boutte, decided to terminate Cox's employment (*Id*., ¶ 90).

6

On March 28, 2024, Woods met with Cox and told her that LHC had decided to terminate her employment effective immediately because of her continued behavior issues despite the recent manager discussion warning her about these concerns (*Id.*, ¶ 91).

On March 28, 2024, after Cox was terminated, she filed a second complaint via LHC's compliance hotline alleging LHC failed to follow policy, improperly discharged patients, and was trying to hide Medicare fraud (*Id.*, ¶ 92).

## II.    Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Incorporated v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### III.   Retaliation Claim

#### A.   Standard

Generally, an employment relationship in Arkansas may be terminated at the will of either party, and employers may discharge employees "for good cause, no cause, or even a morally wrong cause." *Smith v. Am. Greetings Corp.*, 804 S.W.2d 683, 684 (Ark. 1991). A limited exception to the at-will doctrine exists when an employee is terminated in violation of a well-established public policy of the state. *Jenkins v. Mercy Hosp. Rogers*, 633 S.W.3d 758, 764 (Ark. 2021). That public policy must be outlined in Arkansas statutes. *Island v. Buena Vista Resort*, 103 S.W.3d 671, 679 (Ark. 2003); *see also Sterling Drug, Inc. v. Oxford*, 743 S.W.2d 380, 385 (Ark. 1988) (recognizing that "the public policy of a state is found in its constitution and statutes"). The public policy of the State of Arkansas prohibits the termination of at-will employees based on retaliation. *Id.* at 671 (sexual harassment context); Ark. Code. Ann. § 16–123–108.

A *prima facie* case of wrongful discharge or retaliation in violation of public policy is made by presenting substantial evidence that retaliation was a cause of the discharge. *Gen. Elec. Co. v. Gilbert,* 65 S.W.3d 892, 897 (Ark. Ct. App. 2002). The public-policy exception applies when an

8

employee was discharged for reporting a violation of state or federal law. *Jenkins*, 633 S.W.3d at 765 (citing *Sterling Drug, Inc.*, 743 S.W.2d at 385). "The burden of establishing a *prima facie* case of wrongful discharge is upon the employee, but once the employee has met his burden, the burden shifts to the employer to prove that there was a legitimate, [nondiscriminatory or] nonretaliatory reason for the discharge." *City of Huntington v. Mikles,* 240 S.W.3d 138, 143 (Ark. Ct. App. 2006).

### B.    *Prima Facie* Case

LHC argues that Cox cannot establish a *prima facie* case because she did not establish that: (1) she was engaged in any protected activity; (2) the decision maker was aware of her complaints, or (3) there was any relationship between the complaints and her termination.

### 1.    Protected Activity

LHC contends that summary judgment in its favor is warranted because: (1) the record contains no evidence that Cox was concerned about any violation of the law, (2) Cox was acting as a concerned family member instead of as an employee when she made the compliance complaint, and (3) the allegations in the compliance complaint had not occurred, so no violation actually occurred because D.P. was never discharged.

According to LHC, the record reflects that Cox was concerned about violations of internal company policies about discharging patients from hospice care. It is uncontroverted, however, that these specific company policies are designed to keep LHC in compliance with federal regulations and, in fact, closely track with the federal regulations (Dkt. Nos. 19-11, at 1; 19-10). *See* 42 C.F.R. § 418.26. Additionally, LHC makes much of the fact that no violation occurred because D.P. was never discharged. However, as the Arkansas Court Appeals has stated "there is no precedent for the argument that an employee in a wrongful-discharge claim must also prove an

actual violation of law in addition to proving that she was terminated for reporting suspected violations of law." *TFS of Gurdon, Inc. v. Hook*, 474 S.W.3d 897, 903 (Ark. Ct. App. 2015). In short, the Court cannot conclude on this record that Cox lacks sufficient evidence that she was concerned about a violation of the law.

The parties dispute whether Cox was acting as an employee or family member when she made the compliance complaint. D.P. is Cox's sister's father-in-law, and Cox learned of D.P.'s possible discharge from her sister (Dkt. No. 19, at 15). However, Cox clearly identified on the compliance complaint that she was an LHC employee, and her job duties included communication with LHC's patients and their families (*Id.*, at 20). The significance of Cox's lack of direct involvement with the treatment of D.P. is lessened because, in her role with LHC, Cox did not have her own specific patients (*Id.*, at 5). Additionally, at first, Cox refused to speak with Brandy P. about D.P.'s care because she was not authorized to do so (*Id.*, at 15). A reasonable juror could conclude on these facts that Cox was acting as an employee when she made the compliance complaint.

### 2.   Causal Connection

Next, LHC maintains that summary judgment in its favor is appropriate because there is no evidence of any causal connection between Cox's complaint and her termination. In support of this argument, LHC argues that the record is devoid of any evidence that Woods or the decisionmakers with respect to termination were aware that it was Cox who made the complaint. However, Cox points to the fact that the LHC only employed 25 people at its Searcy location, and she directly complained to Woods and Palsay immediately before making the compliance complaint. Viewing the facts most favorable to Cox, a reasonable juror could conclude that LHC

knew, and that Woods and Palsay specifically knew, that it was Cox who made the compliance complaint.

For these reasons, on the record evidence before the Court with all reasonable inferences drawn in favor of Cox, the Court determines that a reasonable juror could conclude that Cox states a *prima facie* case.

### C.    True Reason for Termination

Given the Court's determination regarding Cox's ability to state a *prima facie* case, the burden shifts to LHC to demonstrate that there was a legitimate, nonretaliatory reason terminating Cox's employment. *City of Huntington,* 240 S.W.3d at 143. LHC contends that its decision to terminate Cox was based on her poor work evaluations, client complaints, and conduct towards co-workers and management. According to LHC, this proffered reason is, as a matter of law, a legitimate nonretaliatory basis for its actions with respect to Cox's employment.

The problem, however, is that there is still a question of material fact concerning whether Cox's behavior was the true reason for LHC's actions or whether her compliance complaints motivated LHC's decisions.

LHC relies on counseling forms from various incidents that occurred in 2022 to support its position that Cox had a history of disciplinary problems (Dkt. No. 19, at 6–12). The forms state several issues that LHC had with Cox's job performance (*Id*., at 6–9). However, Cox contemporaneously objected to allegations in the counseling forms (*Id*.). LHC also relies on Cox's performance evaluations from 2022 and 2023, which were "below expectations." (*Id.*, at 11). However, Fry, the former LHC director at the time some of the evaluations occurred, gave Cox a positive reference after LHC terminated her, attesting to her competence and stating she was "very passionate about patient care." (Dkt. No. 19-1, at 2). Furthermore, Cox points to record evidence

11

that she received an overall meets expectations rating in her 2023 review, as well as a meets expectations rating in every category in her 2023 review (Dkt. No. 19, at 12).

LHC cites an incident that occurred on March 7, 2024, when Cox was driving to visit the residence of a deceased patient and received a call that a living patient had fallen (*Id.*, at 28–30). Cox continued to the deceased patient's residence and did not visit the patient who had fallen. The parties dispute what occurred on a call between Woods and Cox and whether LHC policy was violated. However, Woods placed Cox on a 30-day performance improvement plan (*Id.*, at 30).

After LHC received two more complaints from patient family members on March 15, 2024, and 19, 2024, the substance of which the parties dispute (*Id.*, at 31–33), Woods and Butler conducted a meeting with Cox. At the meeting, Woods and Butler discussed Cox's behavior and made it clear that any more complaints would lead to her termination (*Id.*, at 35). The final incident allegedly occurred the very next day in a call between Sawrie and Cox where Sawrie complained that Cox was being "inappropriate and unprofessional." (*Id.*, at 37). However, Cox disputes the content of the call (*Id.*).

Considering the timing of the incidents and the disputed issues of fact related to each incident, the Court determines that genuine disputes of material fact remain as to the actual motivation for Cox's termination. The Court considers these issues best left for a jury to decide. Accordingly, LHC's motion for summary judgment is denied.

IV.    **Conclusion**

For these reasons, the Court denies LHC's motion for summary judgment (Dkt. No. 16).

It is so ordered this the 30th day of March, 2026.

Kristine G. Baker
Chief United States District Court Judge

12